DECISION
{¶ 1} Defendant-appellant Thomas Klein appeals his conviction for receiving stolen property,[1] a fifth-degree felony. After a jury found Klein guilty, the trial court sentenced him to eleven months in prison. We affirm.
 I. Stolen Tools {¶ 2} On September 26, 2003, Klein went to Top Value Muffler to sell some auto-mechanic tools. Robert Taylor and Joe Britto worked there as mechanics.
 {¶ 3} Taylor testified that Britto had told him that morning that a friend of Britto's was coming by with some tools to sell. When Klein arrived, Britto went out to Klein's car. The two men looked at the tools in the trunk of the car for about ten minutes. Britto then called Taylor over to the car and encouraged him to buy some tools.
 {¶ 4} Taylor testified that the trunk of Klein's car had a lot of new Matco tools. He claimed that he was immediately suspicious that the tools were stolen. Taylor testified that he said, "[T]hat's stuff's like too good to even touch because it's hot." According to Taylor, Britto then said, "Oh, man, no, no," and "[H]e didn't get it from nowhere." Taylor also testified that he heard Klein tell Britto, "I got these way out," and "[Y]ou have nothing to worry about."
 {¶ 5} Taylor testified that he did not buy any tools from Klein. But he did see Britto pick out some tools and hand Klein some money.
 {¶ 6} Britto testified that when Klein arrived, he went over to Klein's car, looked at the tools, and purchased some. Britto paid Klein about $400 for several tools. Britto admitted that it was "a good deal," and far less than he would have expected to pay for new Matco tools.
 {¶ 7} Britto testified that he might have asked Klein where the tools came from or whether they were stolen. He said that Klein might have answered, "Nothing to worry about." Britto further testified that he was not sure if Taylor bought any tools.
 {¶ 8} Roy Beck testified that he was a Matco tool salesman in the Northgate area of Cincinnati. On September 24, 2003, Beck's display van was broken into. He estimated that about $10,000 worth of tools were stolen. Several days later, Beck was in Top Value Muffler. Beck had been selling Matco tools to Top Value mechanics for the last ten years. He noticed a tool cart with three new tools that were identical to ones stolen from him. Beck told the police.
 {¶ 9} The following Monday, Patrick Carr, a Forest Park police officer, went to Top Value Muffler and spoke with both Taylor and Britto. Officer Carr saw in Britto's tool cart several tools that Beck claimed had been stolen from him. Carr arrested Britto for receiving stolen property.
 {¶ 10} Britto then told Officer Carr that Klein had sold the tools to him. Carr made a photo lineup of six individuals, including Klein, and showed it to both Taylor and Corey Mann, the manager of Top Value. Both identified Klein as the individual who had been selling tools from the trunk of his car.
 {¶ 11} Officer Carr also testified that Taylor had bought an impact wrench from Klein. Carr stated that Taylor was not charged with any crime because he had been "forthright" when asked if he had bought anything. Carr testified that Taylor admitted that he had bought the wrench and returned it promptly.
 {¶ 12} Klein presented two witnesses in his defense, Lonis Monroe, Klein's girlfriend, and Amanda Mahaffey, Monroe's friend. Both women testified that the night before Klein sold the tools at Top Value, Britto had come over to Mahaffey's house, where Klein, Monroe, and Mahaffey were all living. Both women testified that Britto had arrived with a red toolbox. They said that Britto asked Klein to come to Top Value and to sell the tools that were in the toolbox. Britto, who had previously agreed to fix a problem with Monroe's car, said that he would reduce the charge for working on Monroe's car if Klein agreed to sell the tools. Both women testified that Klein had agreed to the arrangement, and that Britto had left the toolbox with Klein.
 {¶ 13} In his testimony, Britto denied both that he had given Klein the toolbox and that he had asked Klein to sell the tools. He claimed that he did not even know where Mahaffey lived.
 II. Sufficiency and Manifest Weight {¶ 14} Klein now brings three assignments of error, two through his counsel and one pro se. In his first assignment of error, Klein argues that his conviction was supported by insufficient evidence and was against the manifest weight of the evidence.
 {¶ 15} In criminal cases, the legal concepts of sufficiency of the evidence and weight of the evidence are distinct.[2] A challenge to the sufficiency of the evidence attacks the adequacy of the evidence presented. Whether the evidence is legally sufficient to sustain a conviction is a question of law.[3] The relevant inquiry in a claim of insufficiency is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proved beyond a reasonable doubt.[4]
 {¶ 16} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[5] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[6] The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[7]
 {¶ 17} Klein was convicted of receiving stolen property. Under the statute defining the offense, "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."[8]
 {¶ 18} Klein contends that the state did not offer sufficient evidence to establish that the tools recovered by the police were actually stolen from Beck. He also argues that the state did not prove that he knew or had reasonable cause to believe that the tools he sold were stolen.
 {¶ 19} Beck testified that his truck was broken into on September 24, 2003, while it was parked in Forest Park. Several days later, Beck saw tools at Top Value that matched those stolen from him. Top Value was in Beck's sales territory and close to Forest Park. Beck testified that, after the theft, he contacted all eleven of the other Matco salespeople in the greater Cincinnati area and determined that there had been no other recent thefts of Matco tools. Officer Carr also testified that there had been no other reports of stolen Matco tools in the area.
 {¶ 20} In addition, Beck testified that he knew specifics about many of the missing tools. He stated that the tools seized from Britto matched some of the missing items. For example, among the tools stolen from Beck and recovered from Britto were (1) a new Matco socket set that had the Matco brand name stamped in the metal; (2) a Nesco crowfoot wrench set, which also had the brand name on the tools; and (3) an impact wrench that matched a stolen tool — a new product that had been on the market for only several weeks and was not yet widely available in Cincinnati. We conclude that the state presented sufficient evidence to establish beyond a reasonable doubt that the tools Britto bought from Klein had been stolen from Beck.
 {¶ 21} The state also presented sufficient evidence to establish that Klein knew or should have known that the tools were stolen. Both Taylor and Britto testified that when Klein showed them the tools, they immediately suspected that they were stolen. Taylor testified that he hesitated to buy any tools because he suspected they were stolen (though he apparently did buy one item anyway.) Britto testified that he even asked Klein if the tools were stolen. Both Taylor and Britto admitted that the tools were new and were sold for less than new tools typically cost.
 {¶ 22} Most importantly, both Taylor and Britto testified that while looking at the tools, each discussed with Klein the possibility that the tools were stolen. We conclude that, with the evidence viewed in a light most favorable to the state, a rational factfinder could have found beyond a reasonable doubt that Klein knew or should have known that the tools were stolen. Therefore, there was sufficient evidence to support the jury's finding that Klein had received stolen property.
 {¶ 23} Regarding Klein's manifest-weight claim, the jury was presented with conflicting testimony. The jury was free to believe all, some, or none of any witness's testimony. Even if the jury believed Klein's defense that Britto had asked him to sell the tools, the jury still could have found that Klein knew or should have known that the tools were stolen. We conclude that the jury did not lose its way and that Klein's conviction was not against the manifest weight of the evidence.
 {¶ 24} Therefore, we overrule Klein's first assignment of error.
 III. Parole Holder {¶ 25} In his second assignment of error, Klein argues that the trial court erred by failing to credit his sentence with the time that he was held in jail prior to trial.
 {¶ 26} Prisoners must be given credit for the time they have been confined for reasons arising out of the offense for which they are convicted and sentenced.[9] This includes confinement while awaiting trial.[10] But prisoners are not entitled to credit for any period of incarceration that arises from facts separate from those upon which their current sentence is based.[11]
 {¶ 27} Klein was jailed on November 7, 2003. On November 8, 2003, the Adult Parole Authority placed a parole holder on Klein — solely because of the instant charge. Klein was also held because he could not post bond for the pending charge.
 {¶ 28} The trial court gave Klein credit for one day, November 7, but told him that the time he was held from November 8 forward was due to the parole holder. So while Klein had yet to be formally convicted or sentenced for his parole violation, the trial court apparently found that Klein had been held in jail on the parole holder, not for receiving stolen property. But he was being held on both.
 {¶ 29} In State v. Gregory, we held that when a defendant is tried for two offenses but convicted of only one, the trial court, at sentencing, does not have the discretion to allocate pretrial-confinement time to the offense for which the defendant is acquitted.[12] We reasoned that allowing the trial court to credit the time served to a charge that is later dismissed creates "dead time" — punishment without a crime.[13]
 {¶ 30} In Klein's case, we do not know — nor did the trial court know at sentencing — the disposition of Klein's parole violation. It is possible that the Adult Parole Authority did not prosecute Klein on its holder or otherwise violate Klein. If so, the 131 days Klein served in the Hamilton County Justice Center awaiting trial was dead time spent because he was awaiting trial in this case. And again, the parole holder was only based on the conduct alleged in this case.
 {¶ 31} A sentencing court should try to avoid creating dead time because it is fundamentally unfair to the defendant. In Klein's case, the trial court chose to credit the 131 days to Klein's parole holder without knowing the outcome of that prosecution. We think the preferable approach is to require the trial court to credit any time served awaiting trial to the sentence for the crime for which the court has found the defendant guilty. In this case, the trial court found Klein guilty of receiving stolen property and then sentenced him for that crime. The time served should have been credited to Klein's sentence for receiving stolen property because there was no doubt that he was convicted of that offense.[14]
 {¶ 32} The way the trial court allocated Klein's time served — crediting it to the parole holder — was speculative. Klein might have been convicted and recommitted for a parole violation. But he might not have. The trial court simply did not know. The preferable approach, involving no speculation, would have been to credit the time served to the crime for which Klein had already been convicted. He would not then get credit for a recommittal on the parole holding. There would be no "double credit." But even if there could be, we are willing to risk the occasional double jail credit to avoid the much more likely non-credit dead time. The dissent evidently wishes to err on the side of fundamental unfairness and punishment without crime.
 {¶ 33} Therefore, we hold that the trial court erred by not giving Klein credit for time served when it imposed his sentence for receiving stolen property. Accordingly, we sustain Klein's second assignment of error and modify his sentence to reflect that he has been given credit for the time served.
 IV. Perjury {¶ 34} In his third assignment of error, Klein argues, pro se, that he did not receive a fair trial. He asserts that Taylor committed perjury when he testified that he did not buy any tools from Klein. Officer Carr contradicted Taylor by testifying that Taylor had bought a wrench from Klein, but had promptly returned it to the police. Klein contends that the prosecutor knowingly allowed Taylor to testify falsely and therefore denied Klein exculpatory evidence.
 {¶ 35} The state may neither suborn perjury nor introduce testimony that it knows or should know is false without correcting it.[15] A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's judgment.[16]
 {¶ 36} In her opening statement, the prosecutor told the jury that Britto was going to testify that he had bought a number of tools from Klein. The prosecutor then said, "Mr. Taylor, who was standing nearby and observing all of this, did not buy anything."
 {¶ 37} On direct examination, Taylor testified that he immediately suspected that the tools Klein showed him were stolen, and that he walked away. On cross-examination, Taylor continued to deny that he had bought any tools from Klein. Klein's counsel asked Taylor, "[Y]ou're not going to tell us here today that you bought any of these tools, are you?" Taylor responded, "I didn't buy none." Klein's counsel continued, "Well, if you had, you might have been charged as well, right?" Taylor answered, "Possibly, yes." Counsel asked, "Okay. And you are certainly not going to say anything that's going to incriminate yourself, right?" Taylor answered, "Why should I?"
 {¶ 38} But Officer Carr's testimony revealed that Taylor had actually bought a tool from Klein.
 {¶ 39} In closing argument, the prosecutor reviewed the evidence supporting the theory that Klein had disposed of stolen property. The prosecutor noted that Klein had sold tools to Britto and "possibly to Taylor." Later on, when discussing credibility, the prosecutor addressed the fact that Taylor had lied. She stated, "You saw Mr. Taylor in here. I think he was very frank. However, did he admit to us that he had one of the wrenches? No. But it's understandable. He was under oath. He was probably afraid he was going to get in trouble."
 {¶ 40} In the defense's closing argument, Klein's counsel stated to the jury, "[Taylor] says he notices something is wrong immediately and doesn't buy anything. Now, obviously that's been contradicted by the testimony of the officers. * * * So right there Mr. Taylor is lying. Now, why is he lying? Well, [the prosecutor] wants you to think because he doesn't want to get in trouble. But what else is he lying about?"
 {¶ 41} From the record, it is clear that the jury was made aware that Taylor had lied during his testimony. The prosecutor did say in her opening statement that Taylor had not bought any tools. But in her closing argument, she acknowledged that Taylor had possibly bought some tools from Klein and had lied about it while testifying. Furthermore, the defense highlighted the contradiction in the testimony of Taylor and Officer Carr and emphasized that Taylor had lied while under oath.
 {¶ 42} There is no evidence that the state encouraged or knowingly allowed Taylor to lie about whether he had bought tools from Klein. Taylor clearly had his own motivation to downplay his role in the situation. Plus, Taylor's lie was exposed by another of the state's own witnesses.
 {¶ 43} The fact that Taylor lied was clearly brought out at trial and commented on in front of the jury by both the state and the defense. Therefore, we conclude that Klein was not denied any exculpatory evidence. We also conclude that there was no reasonable likelihood that Taylor's false testimony could have prejudicially affected the jury's verdict. The jury was made aware of Taylor's lie and was able to weigh his credibility and factor it into its verdict.
 {¶ 44} Because Klein was not denied a fair trial, we overrule his third assignment of error and affirm the trial court's judgment, except for the modification of his sentence to reflect the credit given for time served.
Judgment affirmed as modified.
DOAN, P.J., concurs.
SUNDERMANN, J., dissents in part.
[1] R.C. 2913.51(A).
[2] See State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[3] Id.
[4] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[5] See State v. Thompkins, supra, at 387.
[6] See id.; State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[7] See State v. Martin, supra.
[8] R.C. 2913.51(A).
[9] R.C. 2967.191.
[10] Id.
[11] See State v. Logan (1991), 71 Ohio App.3d 292, 300, 593
N.E.2d 395.
[12] See State v. Gregory (1995), 108 Ohio App.3d 264, 670 N.E.2d 547.
[13] Id. at 268.
[14] See In re Felver (Apr. 10, 2002), 3rd Dist. No. 2-01-20.
[15] See State v. Sanders, 92 Ohio St.3d 245, 271, 2001-Ohio-189,750 N.E.2d 90.
[16] See Kyles v. Whitley (1995), 514 U.S. 419, 433, 115 S.Ct. 1555, citing United States v. Agurs (1976), 427 U.S. 97, 103, 96 S.Ct. 2392.